UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| STEPHANOS KYRKANIDES, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 5:22-cv-00292-GFVT-EBA |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| UNIVERSITY OF KENTUCKY, *et al.*, | ) | **&** |
| | ) | **ORDER** |
| Defendants. | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Like the prodigal son, this litigation found its way home.  This action, brought by Dr. Kyrkanides against the University of Kentucky after it demoted him from the position of Dean of the College of Dentistry, briefly began in federal court.  Because the Court dismissed Dr. Kyrkanides's only federal claim, the case matured in state court over the last three years.  Now, believing that Dr. Kyrkanides raised new federal causes of action in an amended complaint, UK and Dr. Blackwell want to come home to the Eastern District.  But Dr. Kyrkanides has not, in fact, raised any federal claims.  Instead, his references to federal law merely support but are not necessary to his state law assertions.  In such cases, Congress closes the doors to the federal courthouse, meaning that Dr. Kyrkanides's Motion for Remand **[R. 4]** must be **GRANTED**.

## I

To understand the issues at play, one must review the path that this case has taken.  A 2019 dispute between these parties began in federal court but primarily developed in state court.  Meanwhile, Dr. Kyrkanides brought another action, based on different allegations, in federal court.

Dr. Stephanos Kyrkanides is a former Dean of the University of Kentucky's College of Dentistry. *Kyrkanides v. Univ. of Ky.*, No. 19-6348, 2020 WL 7062675, at *1 (6th Cir. July 29, 2020). In 2019, UK demoted him from Dean but maintained him as a professor. *Id.* The same year, Dr. Kyrkanides sued UK and its Provost, David Blackwell, in the United States District Court for the Eastern District of Kentucky. Amended Complaint, *Kyrkanides v. Univ. of Ky.*, No. 5:19-cv-80-REW (E.D. Ky. Mar. 14, 2019), ECF No. 4. He alleged violations of his right to due process under the Fourteenth Amendment and three state-law claims for termination in retaliation for (1) reporting and seeking to discontinue faculty misuse of funds, (2) exploring employee theft of harvested gold crowns, and (3) supporting an investigation into perceived illegal discrimination at UK. *Kyrkanides v. Univ. of Ky.*, No. 5:19-cv-80-REW, 2019 WL 6135049, at *2 (E.D. Ky. Nov. 19, 2019), *aff'd* 2020 WL 7062675 (6th Cir. July 29, 2020).

District Judge Robert Weir dismissed the Fourteenth Amendment claim with prejudice, and the Sixth Circuit affirmed his decision. *Id.* at *9; *Kyrkanides*, 2020 WL 7062675, at *4. Declining to exercise supplemental jurisdiction over the remaining state law claims, the Court dismissed the remainder of the case without prejudice. *Kyrkanides*, 2019 WL 6135049, at *8–9. Dr. Kyrkanides then took his state-law claims to Fayette County Circuit Court. [R. 1-1 at 4.]

There, his original complaint largely repeated the three state claims that he filed in federal court. As to the first claim, UK policy permitted dental faculty members to receive a portion of the fee collected for patients that they treated. [R. 1-1 at 5 ¶ 12.] Dr. Kyrkanides believed that this practice caused the College of Dentistry to violate a University requirement that salary supplements be paid out of net income rather than gross income. *Id.* ¶¶ 11, 13. Dr. Kyrkanides believes that his decision to report this problem to Provost Blackwell created hostility among his

colleagues. *Id.* ¶ 14.  More to the point, Dr. Kyrkanides alleged that his demotion came in retaliation for reporting these potential issues. *Id.* at 9 ¶ 30.

Similarly, Dr. Kyrkanides's second claim stemmed from his belief that UK employees were stealing gold crowns that belonged to the University.  *See id.* at 9–10.  Dr. Kyrkanides believes that his decision to report this issue led to his demotion.  *Id.* at 11 ¶ 43.

Last, Dr. Kykranides brought a claim under Kentucky's civil rights statute.  *Id.* at 11.  While he was Dean, African American students allegedly complained to Dr. Kyrkanides about discrimination by dental faculty members.  *Id.* at 12 ¶ 46.  Dr. Kyrkanides reported the problem to University officials.  *Id.* at 12–14.  And he believes that the University demoted him in retaliation.  *Id.* at 14.

While his state claims were pending, Dr. Kyrkanides remained a tenured faculty member in the College of Dentistry.  Memorandum of Law at 2, *Kyrkanides v. Capilouto*, No. 5:21-cv-00270-GFVT (E.D. Ky. Nov. 23 2021), ECF No. 4-1.  After his demotion, Dr. Kyrkanides spent one year on administrative leave.  *Id.* at 3.  When he returned to work, Dr. Kyrkanides presented new concerns with University operations to fellow employees.  *Id.* at 4.  His advocacy was so vociferous that administrators worried he was disrupting faculty meetings.  *Id.*  They then muted him during a Zoom videoconference and banned him from attending future meetings.  *Id.* at 4–5.

That decision led to another lawsuit in federal court.  Complaint, *Kyrkanides v. Capilouto*, No. 5:21-cv-00270-GFVT (E.D. Ky. Oct. 23, 2021), ECF No. 1.  This time, Dr. Kyrkanides brought claims for violation of his right to free speech, First Amendment Retaliation, and violation of his Fourteenth Amendment right to due process pursuant to 42 U.S.C. § 1983. *Id.* at 35, 39, 43.

Meanwhile, the 2019 case continued to develop in state court.  In September 2022, Dr. Kyrkanides amended his complaint for the fifth time.  [R. 1-2 at 425, 472.]  Dr. Kyrkanides added a new count styled as "Constructive Discharge."  [*Compare* R. 1-1 at 1–16 (first complaint), *and* R. 1-2 at 299–339 (fourth complaint), *with id.* at 465 (fifth complaint adding constructive discharge count).]  He alleged that UK effectively ended his employment on August 31, 2022.  *Id.* at 471.

This new count claims that the facts alleged in both ongoing lawsuits created a work environment that was so miserable that Dr. Kyrkanides was forced to resign.  *See id.* at 471 ¶ 154.  Dr. Kyrkanides alleges that UK made his workplace intolerable in retaliation for his whistleblower behavior discussed in the 2019 lawsuit, in particular for his report regarding African American students at the College of Dentistry.  *Id.* ¶ 155.  Dr. Kyrkanides points to several actions he believes UK undertook to force his resignation in violation of federal law.  He discusses the First Amendment allegations described in his second federal case.  *Id.* at 466 ¶ 135.  He also alleges that UK forced him to return to in person work during the COVID-19 pandemic, despite his immunodeficiency, in violation of the Americans with Disabilities Act.  *Id.* at 467–69.  However, Dr. Kyrkanides also describes discomfort in his workplace that is unrelated to federal law.  He claims that UK is responsible for his wife working 760 miles from his home in Lexington, that UK interfered with his efforts to secure funding for his research, and that UK conspired to give him a poor performance evaluation.  *Id.* at 466–67 ¶¶ 137–39.

On October 14, 2022, the Fayette Circuit Court granted Dr. Kyrkanides's request to file his Fifth Amended Complaint.  *Id.* at 510.  On November 4, UK and Dr. Blackwell removed the case to federal court.  [R. 1.]  Dr. Kyrkanides filed the instant motion for remand, which argues that the Court lacks subject matter jurisdiction over the case.  [R. 4 at 5.]  Dr. Kyrkanides asserts

that all of the causes of action in his complaint emanate from state law, and, accordingly, the Court cannot exercise federal question jurisdiction over the case. *Id.* UK and Dr. Blackwell disagree and point to the allegations in his constructive discharge claim regarding the First Amendment, the Fourteenth Amendment, and the ADA. [R. 8 at 7.] The matter is now ripe for review.

## II

## A

Federal courts have limited jurisdiction, meaning they only have power to hear cases authorized by Congress. *Gunn v. Minton*, 568 U.S. 251, 256 (2013). In the notice of removal, UK and Dr. Blackwell claim that the Court has jurisdiction pursuant to 28 U.S.C. § 1331. [R. 1 at 3.] Congress permits federal courts to hear "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Out of respect for the independence of state courts, the Supreme Court reads this grant of jurisdiction narrowly to keep state-law actions in state court. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374, 389–90 (2016). To do so, the Court imposes limiting requirements on the phrase "arising under" as used by Congress. 13D Charles Alan Wright & Arthur Miller, *Federal Practice and Procedure* § 3562 (3d ed. 2023). To arise under federal law for the purposes of Section 1331, a claim must satisfy the well-pleaded complaint rule and the substantiality requirement. *Id.*

These requirements are most obviously met when a plaintiff brings a claim under a federal cause of action. *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005). But claims based on state law can sometimes satisfy federal question jurisdiction if they implicate a substantial federal issue. *Id.* "This is a 'special and small category' of claims." *Fried v. Sanders*, 783 Fed. App'x 532, 534 (6th Cir. 2019) (Siler, J.) (quoting *Empire*

*Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 699 (2006)).  For a federal court to have jurisdiction over a state law claim under Section 1331, the embedded federal issue must be: (1) necessarily raised and actually disputed, (2) substantial, and (3) capable of resolution in federal court without disrupting the federal-state balance approved by Congress.  *Gunn*, 568 U.S. at 258.

**1**

There can be little doubt that the federal issues are actually disputed.  Dr. Kyrkanides and UK are currently litigating his First Amendment, First Amendment retaliation, and Fourteenth Amendment allegations before this Court.  Complaint at 35, 39, 43, *Kyrkanides v. Capilouto*, No. 5:21-cv-00270-GFVT (E.D. Ky. Oct. 23, 2021), ECF No. 1.  While the Court is unaware of any suit over his ADA claims, UK challenges the factual basis for them.  [*See* R. 8 at 10 (describing Dr. Kyrkanides's health issues as a "secret malady").]

That said, Dr. Kyrkanides's allegations regarding the Constitution and the ADA are not necessarily raised in his state-law claim for constructive discharge.  A federal issue is not necessary to a claim if other proof presented by the plaintiff could satisfy the elements of the plaintiff's state law claim.  *See Fried*, 783 Fed. App'x at 535–36 (violations of federal law were proof of some elements of an intentional infliction of emotional distress claim, but the complaint recited "numerous actions by defendants having nothing to do with federal law" as other proof).  If the plaintiff could win or lose regardless of the resolution of the federal allegations, the embedded claims do not establish arising under jurisdiction.  *Id.*

Count IV of the Fifth Amended Complaint styles itself as bringing a claim for "Constructive Discharge."  [R. 1-2 at 465.]  Under Kentucky law, constructive discharge "is a cause of action for which a jury may award damages or other relief."  *Louisville-Jefferson Cnty. Metro Gov't v. Martin*, Nos. 2007-ca-001629 and 2007-ca-001803, 2009 Ky. Unpub. LEXIS 387,

6

at *10 (Ky. Ct. App. June 12, 2009).  It can also be a theory that satisfies an element of another

state cause of action.  *See Cvitkovic v. Freeman*, No. 2008-CA-001647-MR, 2010 Ky. App.

Unpub. LEXIS 1000, at *4–5 (Ky. Ct. App. Aug. 6, 2010) (explaining that constructive discharge

could be used to show that a plaintiff "suffered adverse employment actions" for the claim of

hostile work environment under KRS 344.040); *Deane v. W. Ky. Univ.*, No. 2021-CA-0083-MR,

2022 Ky. App. Unpub. LEXIS 281, at *11 (Ky. Ct. App. May 20, 2022) (discussing constructive

discharge as a theory to satisfy the breach element for a breach of contract claim); *Pearce v.

Whitenack*, 440 S.W.3d 392, 395 (Ky. 2014) (rejecting an argument that an officer, by resigning,

did not waive a statutory right to a hearing because he was constructively discharged).

It is unclear whether Dr. Kyrkanides pleaded Count IV as an independent cause of action

or a theory to permit him to recover for his claims for illegal retaliation.  To the extent that he

offers constructive discharge in support of his other claims, Count IV and its discussion of

federal issues are merely one way that Dr. Kyrkanides could prove that his other state-law claims

are viable.  In that case, because constructive discharge is just another theory that could satisfy

Dr. Kyrkanides's claims, it is not necessary.

To the extent that he asserts an independent cause of action, the federal issues are still not

necessary to establish constructive discharge.  To succeed on a constructive discharge claim, a

plaintiff must show that "the conditions created by the employer's actions are so intolerable that

a reasonable person would feel compelled to resign."  *Pearce*, 440 S.W.3d at 400 (quoting

*Turner v. Pendennis Club*, 19 S.W.3d 117, 121 (Ky. App. 2000)).  The crux of Dr. Kyrkanides's

constructive discharge argument is that his workplace became extremely unpleasant.  To add

spice to the dish that he served the state court, he described some of the distasteful aspects of his

job as potential violations of the United States Constitution and the ADA.

But Dr. Kyrkanides also described several non-federal issues with his workplace, including his perception that UK retaliated against him for reporting racial discrimination, his wife's relocation to another state, UK's alleged interference with his ability to generate grant money for research, and UK's allegedly biased performance evaluations. [R. 1-2 at 466–67 ¶¶ 137–39]; *see Drury v. Univ. of Louisville*, No. 3:19-cv-282, 2020 U.S. Dist LEXIS 48621, at *10 (W.D. Ky. Mar. 20, 2020) (where plaintiff included alternative bases for negligence along with her ADA allegations, the federal issues were not necessary). Should the state court factfinder conclude that these allegations occurred, Dr. Kyrkanides could possibly show that a reasonable person would have felt compelled to resign without reference to the federal issues. The federal allegations are not strictly needed to resolve the constructive discharge claim.

2

The federal matters embedded in Dr. Kyrakanides's constructive discharge claim are not substantial in the manner contemplated by prior cases. The Sixth Circuit considers four factors to determine whether a federal issue is substantial:

> (1) whether the case includes a federal agency, and particularly, whether the agency's compliance with the federal stature is in dispute; (2) whether the federal question is important (i.e. not trivial); (3) whether a decision on the federal question will resolve the case (i.e. the federal question is not merely incidental to the outcome); and (4) whether a decision on the federal question will control many other cases (i.e. the issue is not anomalous or isolated).

*Estate of Cornell v. Bayview Loan Servicing, LLC*, 908 F.3d 1008, 1015 (6th Cir. 2018) (quoting *Mikulski v. Centerior Energy Corp.*, 501 F.3d 555, 570 (6th Cir. 2007) (en banc)). Only one of these factors meaningfully points towards jurisdiction existing over this case.

UK and Dr. Blackwell argue that Dr. Kyrkanides's assertions regarding the ADA are important because other, similar plaintiffs might argue that a return-to-work mandate during a

8

pandemic violates the ADA.  [R. 8 at 10.]  This case would then provide "significant precedent for this District, the Sixth Circuit, and Federal courts across the country."  *Id.*  Accordingly, they believe the federal government has a significant interest in seeing that body of case law develop in federal court.  *Id.*

This argument is diminished by the fact that any precedent developed by the Fayette Circuit Court would not apply to subsequent suits in federal court.  *See Gunn*, 568 U.S. at 262. While the federal courts do have some interest in developing the contours of these ADA claims, that alone does not create jurisdiction.  *See Fried*, 783 Fed. App'x at 536 ("It is true that Congress created a private cause of action under RICO and the federal courts have some interest in delineating its contours.  But that alone does not show substantiality.").  It is not clear that allowing a state court to resolve this case would interfere with the federal body of law on the ADA.  *See Gunn*, 568 U.S. at 262.

However, even assuming that this factor indicates that jurisdiction is appropriate, the other factors do not.  Two plainly disfavor the conclusion that this case presents substantial federal questions.  There is no federal agency involved.  And, as explained at length, the embedded issues are not necessary to the resolution of the case.

The remaining factor concentrates on the importance of the issue.  A federal issue is significant for these purposes if it matters to the federal government writ large.  *Gunn*, 568 U.S. at 261.  The importance to the parties at hand is irrelevant.  *Id.*  There are no bright line rules that determine whether the embedded claim is substantial.  *Fried*, 783 Fed. App'x at 536 (citing *Grable*, 545 U.S. at 317).  The inquiry demands careful consideration of the case at hand.  *Id.*

Prior decisions offer some guidance.  The federal government has a significant interest in a uniform system for the collection of taxes.  *Grable*, 545 U.S. at 310–11.  In *Grable*, the Internal

Revenue Service seized property and sold it to satisfy a federal tax delinquency. *Id.* The

delinquent owner of the property later tried to reclaim it from a subsequent purchaser by

pursuing a state law quiet title action. *Id.* The case would have required a state court to decide

whether the IRS complied with federal notice requirements prior to the sale. *Id.* The Supreme

Court held the issue to be important to the federal system because of the IRS's interest in a clear

set of rules for enforcing tax liens. *See Gunn*, 568 U.S. at 260–61 (interpreting *Grable*).

Likewise, the federal government has an important interest in vindicating the validity of

bonds that it issues. *Smith v. Kansas City Title & Tr. Co.*, 255 U.S. 180, 201–02 (1921). In

*Kansas City Title & Trust*, a shareholder brought a state-law claim to prevent a bank from

purchasing bonds issued by the federal government. *Id.* at 198. He argued that the bank could

only trade in bonds that were validly authorized by the government and that the statutes that

created the federal bonds were unconstitutional. *Id.* The Supreme Court found this issue to be

substantial because the federal system has an inherent interest in determining whether the

securities that it issues are valid. *See Gunn*, 568 U.S. at 261 (interpreting *Kansas City Title &*

*Trust*).

Here, there is no comparable stake in the outcome of the litigation for the federal

government. If the Fayette Circuit Court determines that UK violated Dr. Kyrkanides's

constitutional rights, the result will be financial liability for a state institution. That decision

would not have ramifications that threaten to undermine the functions of the federal system.

This is a local case that will have local effects. It does not present a substantial federal question.

**3**

Finally, allowing this case to move forward in federal court would upset the balance

between state and federal jurisdiction. "[T]he presence of a disputed federal issue and the

ostensible importance of a federal forum are never necessarily dispositive; there must always be an assessment of any disruptive portent in exercising federal jurisdiction." *Grable*, 545 U.S. at 314. Arising under jurisdiction may be exercised over a state claim where it will "portent only a microscopic effect on the federal-state division of labor." *Id.* at 315. By contrast, federal question jurisdiction does not extend to extremely common, state-law claims, because allowing a federal issue to open the courthouse doors to such claims would attract "a horde of original filings and removal cases raising other state claims with embedded federal issues." *Eastman*, 438 F.3d at 553.

"Employment litigation is a common occurrence in both federal and state courts." *Id.* Congress has specifically opened the door to the federal courts for some employment claims. *Id.* (discussing Title VII and the ADA). But most employment law is litigated through the state courts. *Id.* Accordingly, federal courts should avoid upsetting the balance between themselves and state courts by allowing employment claims based on state claims for wrongful termination in violation of public policy to come into federal court "by the simple expedient of referencing federal law as the source of that public policy." *Id.*

However, Congress's decision to provide a private right of action for the ADA undermines this concern. *See Bayview Loan*, 908 F.3d at 1016. At times, the Supreme Court has myopically focused on whether the embedded federal claims, themselves, contain a private right of action. *See Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 817 (1986) ("We conclude that a complaint alleging a violation of a federal statute as an element of a state cause of action, when Congress has determined that there should be no private, federal cause of action for the violation, does not state a claim 'arising under the Constitution, laws, or treaties of the United States.'"); *see also Charvat v. EchoStar Satellite, LLC*, 630 F.3d 459, 563 (6th Cir. 2010) (In

*Grable*, "[t]he Court clarified that the existence of a private right of action in a federal statute, while *sufficient* to establish federal-question jurisdiction, is not indispensable."). So, courts will, at times, focus on Congress's decision to include, or not to include, a private right of action in the embedded claim to determine whether admitting state claims into federal court would upset the balance between the two judicial bodies. *See Bayview Loan*, 908 F.3d at 1016.

That said, the Court has found federal-question jurisdiction lacking where the embedded federal issue comes from a statute that contains a private right of action but other, non-federal issues can independently resolve the state law claims. *See Christianson v. Cold Indus. Operating Corp.*, 486 U.S. 800, 810 (1988) (embedded patent claim); *see also* Wright & Miller, *supra*, § 35621 ("Finally, on another point, the Supreme Court held that a claim supported by alternative theories in the complaint may not provide the basis for federal question jurisdiction unless federal law is essential to each of the theories."). Thus, district courts have applied the modern test from *Gunn* and *Grable* to find that First Amendment and ADA issues embedded within state law claims do not arise under federal law. *See Sobel v. Cameron*, No. 3:22-cv-570, 2022 U.S. Dist. LEXIS 225090, at *4 (W.D. Ky. Dec. 13, 2022) (First Amendment issue embedded in state law claim not necessary); *Briggs v. LSM Props. of Ky., LLC*, No. 3:16-cv-00619-GNS-DW, 2017 U.S. Dist. LEXIS 58657, at *7–9 (W.D. Ky. Apr. 17, 2017) (ADA claim embedded in negligence claim not substantial); *see also Fried*, 783 Fed. App'x at 536 ("It is true that Congress created a private cause of action under RICO and the federal courts have some interest in delineating its contours. But that alone does not show substantiality.").

Allowing this case to proceed here would disturb the balance between state and federal court. The Sixth Circuit has expressed a strong preference for leaving state employment claims in state court. *See Eastman*, 438 F.3d at 553. While Congress did choose to include a private

right of action in the ADA, other, non-federal allegations could be outcome determinative. *See Christianson*, 486 U.S. at 810.  If this matter were to remain in federal court, a welcome matt would be placed outside the federal courthouse for a slew of state, employment claims that feature a nonessential, federal allegation. *See Eastman*, 438 F.3d at 553.

**B**

One final argument from UK and Dr. Blackwell must be mentioned.  They argue that the Court should view the Fifth Amended Complaint as directly asserting federal claims rather than using federal issues as subsidiary proof of a state law claim.  [R. 8 at 7–8.]  If that is true, then the path to jurisdiction would be much more straightforward. *Eastman*, 438 F.3d at 550.  To make their case, UK and Dr. Blackwell cite a prior decision of this Court.  [R. 8 at 7–8.]

In *Ludwig v. Kentucky Department of Military Affairs*, Denise Ludwig asserted that her employer paid her less than her male counterparts in violation of 29 U.S.C. § 206(d)(1) and KRS 337.423. *Ludwig v. Ky. Dep't Mil. Affs.*, No. 6:13-cv-00174-GFVT, 2014 WL 2218677, at *1 (E.D. Ky. May 28, 2014).  Ms. Ludwig's complaint asserted a cause of action for "Equal Pay" that claimed her employer's practice was "specifically prohibited by 29 U.S.C. § 206(d)(1) and KRS 337.423(1)." *Id.* at *2.  Ms. Ludwig argued that her claim sounded in state law and that her citation to a federal statute was ancillary to her true cause of action. *See id.* at *3 (discussing three cases where mere citation to a federal statute did not invoke arising under jurisdiction).

The Court disagreed, noting that the analysis for causes of action where the right to recover is created by federal law is distinct from those where a state law entitles the plaintiff to relief. *See id.* at *4 (discussing the foundational case of *Am. Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916) (Holmes, J.)).  Because the federal statute created a private right of action that could provide relief for an "Equal Pay" claim, the fact that Ms. Ludwig also cited

13

to a state law did resolve the matter. *Id.* at *5. Federal law could have provided Ms. Ludwig with the same relief that she sought from the state statute. *See id.* at *5; *see also Am. Well Works*, 241 U.S. at 260 ("[W]hether it is a wrong or not depends upon the law of the state where the act is done, not upon the patent law, therefore the suit arises under the law of the state. A suit arises under the law that creates the cause of action.").

Like *Ludwig*, the ADA allowed Dr. Kyrkanides to bring a claim for constructive discharge. *See Green v. BakeMark USA, LLC*, 683 Fed. App'x 486, 495 (6th Cir. 2017). Unlike Ms. Ludwig, however, Dr. Kyrkanides did not frame his entire Constructive Discharge claim as a violation of both state and federal law. Ms. Ludwig listed her factual allegations and concluded they were "prohibited by 29 USC § 206(d)(1) and KRS § 337.423(1)." *Ludwig*, 2014 WL 2218677, at *5. Dr. Kyrkanides identifies a laundry list of actions undertaken by his employer, only some of which he claims violated the ADA. [*See* R. 1-2 at 470.] He also frames the alleged federal violations as part of UK's attempt to retaliate against him, in violation of state law, by creating a work environment that forced him to resign. *See id.* at 470 ¶ 153. He concludes that all the "intolerable conduct was because [Dr. Kyrkanides] was trying to correct unlawful activities in the College of Dentistry" in violation of the "Kentucky Whistleblower Act and KRS 344.280 and against Public Policy . . . ." *Id.* at 471 ¶ 155.

Whereas the complaint in *Ludwig* could be read to assert causes of action under both federal and state law, Dr. Kyrkanides chose to plead his claims under state law, only using federal law to support his public policy argument. "[T]he plaintiff is the master of his complaint, and the fact that the wrong asserted could be addressed under either state or federal law does not ordinarily diminish the plaintiff's right to choose a state law cause of action." *Alexander v. Elec. Data Sys. Corp.*, 13 F.3d 940, 943 (6th Cir. 1994). Kentucky law specifically recognizes a claim

14

for wrongful discharge in violation of public policy. *Firestone Textile Co. Div., Firestone Tire & Rubber Co. v. Meadows*, 666 S.W.2d 730, 732 (Ky. 1983). For this claim, the public policy can come from constitutionally protected activity or legislative determination. *Id.* at 733. Dr. Kyrkanides chose to bring a claim for a violation of Kentucky law and to support it with references to federal public policy. *See Warthman v. Genoa Twp. Bd. of Trs.*, 549 F.3d 1055, 1064 (6th Cir. 2008) ("A reference to the U.S. Constitution in a complaint should be read in the context of the entire complaint to fairly ascertain whether the reference states a federal cause of action or . . . simply supports an element of a state claim."). This is not a case, as in *Ludwig*, where the face of the complaint pleads alternative violations of state and federal law. *See* Ludwig, 2014 WL 2218677, at *2.

Arising under jurisdiction has two pathways of analysis. *Ludwig*, 2014 WL 2218677, at *4. Because Kentucky law will decide whether Dr. Kyrkanides can recover for his claim, this case must be assessed under the more exacting analysis for state causes of action, rather than the "'well-worn thoroughfare,' which 'admits litigants whose causes of action are created by federal law . . . .'" *Id.* (citing *Eastman v. Marine Mech. Corp.*, 438 F.3d 544, 550 (6th Cir. 2006)); *c.f.*, *Am. Well Works*, 241 U.S. at 260. Viewed from the proper perspective, the Court lacks jurisdiction over Dr. Kyrkanides's claims.

### III

UK and Dr. Blackwell want the Court to welcome this prodigal son home. But Congress determines when a federal court can open its doors. UK and Dr. Blackwell removed this case pursuant to U.S.C. § 1441(a). [R. 1 at 3.] A district court only has jurisdiction over a case removed under Section 1441(a) if the claims could have been brought in federal court. *Estate of Cornell v. Bayview Loan Servicing, LLC*, 908 F.3d 1008, 1011 (6th Cir. 2018). The Court lacks

jurisdiction to hear this case under 28 U.S.C. § 1331.  Accordingly, for these reasons, it is hereby

**ORDERED** as follows:

1. Plaintiff Stephanos Kyrkanides's Motion to Remand **[R. 4]** is **GRANTED**;

2. This matter is **REMANDED** to the Fayette County Circuit Court for further proceedings; and

3. This case is **STRICKEN** from the Court's active docket.

   This the 22nd day of June 2023.

Gregory F. Van Tatenhove
United States District Judge